# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN  DIVISION

COMMUNITY CREDIT UNION, ET AL. §
§
V.                                              §                CASE NO. 4:05CV285
§                (Judge Schell/Judge Bush)
NATIONAL CREDIT UNION            §
ADMINISTRATION, ET AL.            §

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Community Credit Union ("CCU") brought this action for preliminary injunction against the National Credit Union Administration ("the NCUA" or "Administration") and others challenging the NCUA's refusal to approve the balloting procedure implemented by CCU (and approved by the NCUA) to convert from a credit union to a mutual savings association. At oral argument, the NCUA represented that it had no objection to having the case determined as a final injunction on the merits. Therefore, CCU's Motion to Advance Trial on the Merits (Docket #5) is GRANTED.

CCU's complaint focuses on the NCUA's refusal to certify CCU's members' votes converting CCU from a Texas chartered credit union to a federal mutual savings association, despite the fact, as it alleges, that the Texas Credit Union Department ("TCUD") and the Office of Thrift Supervision ("OTS") have approved the change. CCU alleges that its members voted overwhelmingly to convert the institution but that the NCUA refused to recognize the "will of a 71% majority." CCU alleges that the gist of the action centers on how a piece of paper was folded in the mailings sent to its members. The NCUA contends that the issue is whether members received accurate information that was not misleading. However, the manner in which the agreed notice disclosure was folded is the only issue as to whether the required disclosure was in fact accurate and not misleading. The NCUA contends that the required notice should have been folded to insure that the first document members saw was the NCUA required disclosure rather than CCU's rebuttal,

which was on the opposite side of the disclosure.

CCU filed this declaratory action and request for preliminary injunction contending the NCUA had violated the Federal Credit Union Act by enacting illegal regulations in violation of 12 U.S.C. § 1785(b)(2)(G)(i) because the Administration's regulations are not consistent with and are more restrictive in their design and implementation than rules enacted by other financial regulators. CCU also seeks a declaratory judgment that the actions of the NCUA were arbitrary and capricious. CCU further requests declaratory relief on other issues which the Court need not address in light of the ruling herein.  CCU raises several grounds for jurisdiction, including jurisdiction pursuant to 28 U.S.C.  §§ 1331 and 1346 and 28 U.S.C. § 1983 and 12 U.S.C. § 1789.

The NCUA's version of the facts and nature of dispute are set forth in its response to CCU's Motion for Preliminary Injunction.  The NCUA contends that, by letter dated December 29, 2004, CCU, through its counsel Silver, Freedman & Taff, informed the NCUA that it intended to convert to a federally-chartered mutual savings institution (*See* CCU Admin. Rec. ("CCU/AR"), at 0760-0793).  The letter requested that the NCUA review "the contents of the materials to be provided to the Credit Union's members and advise us (CCU) if there is a problem with the methods and procedures for the membership vote" (*Id.* at 0760).  By letters dated December 29, 2004, CCU filed applications relating to the intended conversion with the Federal Deposit Insurance Corporation ("FDIC") and the OTS ( *Id*. at 0759, 0757).  By letter dated January 20, 2005, CCU forwarded the NCUA additional disclosure materials to supplement CCU's December 29, 2004 submission relating to the proposed  conversion (CCU/AR at 0738-0742).  CCU noted that "the additional materials are intended to comply with the requirements of Section 708a.4(e) of the new regulations adopted by [NCUA] on January 13, 2005 in connection with conversion of insured credit unions to mutual savings banks" (CCU/AR at 0738).  With regard to new disclosure requirements, CCU noted:

[T]he credit union intends to insert the Section 708a.4(e) disclosure (and the Credit

> Union's responses) immediately following the 'Notice of a Proposal to Approve a
> Plan of Mutual Charter Conversion and of a Special Meeting of Members' (the
> 'Notice'). . . . All of the NCUA required materials (Notice and 708a.4(e) disclosure)
> will precede the Credit Union's additional disclosure information.

(CCU/AR at 0738-0739).   By letter dated January 28, 2005, NCUA responded to CCU's intended

placement of the Section 708a.4(e) disclosures:

> In the third paragraph it is proposed to insert the required Section
> 708a.4(e) disclosures immediately following the Notice of Proposal to Approve a Plan
> of Mutual Charter Conversion and of Special Meeting of Members" (Notice).  This
> placement is not acceptable.  The disclosure must be in a prominent place, and
> conspicuous to the credit union's members.  Therefore, it must be included either as
> a separate document comprising the first page of the written communication, or
> incorporated into the text of the first page of the Notice.

(CCU/AR at 0718).

According to the NCUA, for the next several months, the NCUA and CCU continued to

engage in discussions and negotiations before the notice documents were finalized (*See, e.g., Id.* at

0631-0709, 0614-0630; Cmplt. at ¶ 14).  Many of these discussions were oral communications

between the NCUA's and CCU's attorneys.  (*See, e.g.*, CCU/AR at 0608, 0578).  In particular, James

Fleischer, an attorney for Silver, Freedman & Taff, contacted the Office of the General Counsel

("OGC") at the NCUA to discuss how CCU could comply with the "prominent and conspicuous"

requirement regarding the boxed disclosures  (CCU/AR at 0003).  According to the NCUA, CCU

requested to place the boxed disclosures immediately following an introductory letter to members

(the "Dear Member" letter) and before the rest of the materials being sent (*Id.*).  CCU also requested

to place a rebuttal to the boxed disclosures, entitled "YOUR CREDIT UNION WANTS YOU TO

KNOW THE FACTS," on the reverse side of the boxed disclosures (*Id.*).  The NCUA claims that

CCU's request raised concerns for the NCUA given that the boxed disclosures were central to the

NCUA's conversion rules; in particular, the NCUA was concerned that CCU's requests could

materially diminish the effectiveness of the disclosures in informing credit union members of critical

information about the conversion  (*Id*.).  The NCUA, however, agreed to CCU's request to include

a rebuttal on the reverse side of the boxed disclosures, provided that the boxed disclosures were the

first thing a member would see after the "Dear Member" letter  (*Id*. at 0004).  However, the Court

notes that this specific requirement is not in the record prior to the NCUA's decision not to validate

the vote.  It is at best an after-the-fact attempt to bolster the NCUA's position on the issue which,

in the Court's opinion, is suspect.  Although the NCUA contends that its general counsel  relayed

this message to Mr. Fleischer on or about February 28, 2005, such does not appear in the record

except in the post decision letter referenced above  (*Id*.).  By letter dated March 2, 2005, CCU

submitted revised documents and stated:

> [i]n response to the comments received from Frank Kressman, Esquire of the
> [NCUA] by telephone on February 28, 2005, enclosed are the following revised
> documents marked to show changes made to the prior documents submitted to your
> offices under cover letters from Silver, Freeman & Taff, L.L.P. dated February 4,
> 2005 and February 9, 2005.

(*Id.* at 0608).  The NCUA contends that the "order of documents" is reflected in the attachments to

the cover letter.  The Court notes that there was no agreement as to the order but merely a notation

of the documents that would be furnished to the members.

By letter dated March 31, 2005, the NCUA informed CCU that it was providing preliminary

approval to the proposed methods and procedures applicable to the membership vote (CCU/AR at

0550-0551).  Specifically, the NCUA  stated:

> The final revisions were received on March 16, 2005.  Based on my review of these
> revised documents, I am granting preliminary approval for the proposed methods and
> procedures applicable to the membership vote.  As previously indicated, NCUA
> continues to reserve its right to object to the conversion process at its conclusion
> should the actual documents provided to the members or the procedures used differ
> from those explained in your letters or if the vote is not conducted in a fair and legal
> manner.

(*Id.* at 0550).

On or about March 21, 2005, CCU sent out its first mailing to its members.  (Cmplt. at ¶18).

The second mailing was sent on April 22, 2005 (*Id.* at ¶ 19).  By letter dated May 13, 2005, the NCUA informed CCU that it had failed to provide members with required disclosure materials in compliance with 12 C.F.R. § 708a.4(e) (January 28, 2005) ( CCU/AR at 0437-0440).   The NCUA further informed CCU that if the violation was left uncorrected, the NCUA would disapprove the methods and procedures applicable to the member vote under 12 C.F.R. § 708a.7 and would direct a new vote (CCU/AR at 0437).  In the same letter, the NCUA informed CCU that it  had investigated and confirmed member complaints that the rebuttal was enclosed on the front side and the required disclosures on the back for both the first and second set of mailings sent by CCU  (*Id.* at 0438).  As a result of the violation of Section 708a.4(e), the NCUA declared that all ballots received from the members were invalid as the product of the improper disclosures, and that to remedy the violation, CCU would have to "1) begin anew the notice mailing process making certain it satisfies the "prominent and conspicuous" requirement and other aspects of §708a.4(e), and 2) discount all ballots associated with the improper disclosures and begin the voting process again" (CCU/AR at 0438).

In response to this communication, on the third ballot, CCU folded the disclosure document in the reverse manner in which it had folded the document before.  Notwithstanding the NCUA's order to change the mailing procedure, the NCUA refused to honor the election.  On June 29, 2005, the OTS issued an Order approving the conversion.  In its order, the OTS verified that CCU followed the methods and procedures applicable to the member vote.  On June 29, 2005, CCU submitted its request for the NCUA's approval of its members' vote approving CCU's' plan to convert to a federal mutual savings bank. (CCU/AR at 0016-0037;Cmplt. at ¶ 27).  CCU presented its certification which stated that out of 36,042 members who participated in the vote, 71.5% voted in favor of the conversion (CCU/AR at 0016).  On July 5, 2005, TCUD, the state regulatory agency, approved CCU's application to convert to a mutual savings bank, subject to OTS's issuance of a mutual savings bank charter (CCU/AR at 0011-0015; Cmplt. at ¶ 28).  In its Conclusions of Law, TCUD

found that "[NCUA] has furnished evidence that the NCUA was agreeable to the proposal for conversion" (CCU/AR at 0014).  However, the NCUA had not yet issued any decision regarding the methods and procedures applicable to the member vote at the time TCUD issued its own approval (*Id*. at 0001-0010).  By letter dated July 11, 2005, the NCUA informed CCU that the NCUA disapproved the methods and procedures applicable to the member vote and directed a new vote be taken pursuant to 12 C.F.R. § 708a.7(b) (CCU/AR at 0001-0010).  The basis for the decision was that CCU failed to follow the NCUA's directive and place the required Section 708a.4 disclosures in a prominent place with each of its written communications to its members and in a manner where they would be conspicuous to the members  (CCU/AR at 0001-0010).  The NCUA determined that CCU's actions resulted in a flawed vote and, pursuant to its statutory and regulatory authority, directed  that a new vote be taken  (*Id.* at 0009).

As CCU points out, the NCUA's new disclosure rules require that certain disclosures be placed inside a boxed area and contain capital letters with bold-faced type.  The disclosures cover such issues as ownership and control by the members, the effect of certain expenses on rates and services, the possibility of a subsequent conversion to a stock issuing bank, and costs of conversion.  *See Conversion of Insured Credit Unions to Mutual Savings Banks*, 70 Fed. Reg. 4,005 (2005) (to be codified at 12 C.F.R. pt. 708a).  The NCUA interprets its responsibility to review the methods and procedures of the member vote to include determining that the member notice and other materials sent to the members are accurate and not misleading.  *Id.*  The NCUA's authority to promulgate final rules regarding charter conversions is limited to rules that are: "(1) consistent with the Credit Union Membership Access Act, Public Law 105-21; (2) consistent with the charter conversion rules promulgated by other financial regulators; and (3) no more or less restrictive than rules applicable to charter conversions of other financial institutions." *Id*.  The manner in which the disclosure was folded is the gravamen of the NCUA's action irrespective of its spin that the real issue is one of

6

conspicuousness.  At the time the current disclosure rules were enacted, the NCUA published the

following comments:

> A converting credit union can provide information to its members regarding any
> aspect of the conversion *in any format it wishes*, provided all communications are
> accurate and not misleading.  NCUA only requires that certain minimal information
> be provided in the notice to members....NCUA will continue to allow a converting
> credit union to communicate with its members as it sees fit, but will require that
> members receive a short, simple disclosure prepared by the NCUA...A converting
> credit union must include this disclosure in a prominent place with each written
> communication .... and must take specific steps to insure that the disclosure is
> conspicuous to its members.

*Id.* at 4006 (emphasis added).  The NCUA approved the format of the disclosure with the disclosure

on one side of the paper and the response on the other side of the paper.  The disclosure was, in

effect, modified with the consent of the Administrator as provided.  *Id*. Even the Administrator

admits there were no folding requirements (CCU/AR at 00004.  At argument, the Administrator

stipulated that, but for the "folding issue," the requirement of prominence and conspicuousness were

met as to the notice.  Prominent is defined as readily noticeable. MERRIAM WEBSTER'S COLLEGIATE

DICTIONARY, 10th Ed. 1998).  Conspicuous is defined as obvious to the eye or mind. *Id.*  Sample

mailings were included in the record.  Regardless of how the paper was folded, once unfolded,

CCU's response pointed the reader to the NCUA's required disclosure: "The disclosures provided

on the reverse side are required by the NCUA."   In addition, CCU addresses each of the four

categories required by the NCUA disclosure.  Each category is separately listed in a smaller font than

that of the NCUA's required disclosure.  The NCUA format is also enclosed in a box, which is not

the case for the CCU response. On the surface, it appears that the NCUA's disclosure was more

prominent and conspicuous than  CCU's response.  There is nothing in how the disclosure was

folded which would make it less obvious than CCU's response.  The NCUA's position that, by

unfolding the document, the reader would first see CCU's response does not render the disclosure

less conspicuous or prominent.  The disclosure is in a bolder font, enclosed in a box and referenced

on the opposite side of the page for the reader's review.  It is a disclosure in a format pre-approved

by the NCUA --a disclosure on one side of a two sided document.

The Court notes that neither the OTS nor the Comptroller have promulgated regulations

requiring disclosures about the impact of a charter conversion to the public.  *Compare generally* 12

C.F.R. pt. 708a with 12 C.F.R. pt. 563b.135; 12 C.F.R. pt. 563b.180; 12 C.F.R. pt. 516.50-80; 12

C.F.R. pt. 563b.235; 12 C.F.R. pt. 552.2-1; 552.2-6; 12 C.F.R. pt. 552.2-7 and 12 C.F.R. pt. 563.22;

12 C.F.R. pt. 5.8; 12 C.F.R. pt. 5.32; and 112 C.F.R. pt. 303.160 *et. seq*.  CCU contends that 12

U.S.C. § 1785(b)(2)(G)(i) only allows the NCUA to disapprove "the methods by which the member

vote was taken or procedures applicable to the member vote." There is no regulation on how the

boxed disclosures must be folded or where they must be placed among the other disclosures

provided.

The Court has reviewed the briefs and materials, including a number of amici briefs filed by

those with interests in the outcome of the Court's ultimate decision.  The parties have also presented

their respective positions by oral argument.  At oral argument, the parties agreed that the Court

should confine its review of the agency's action to the record.  5 U.S.C. § 706 provides for this

Court's review of agency action.  The statute, in part,  states that "The reviewing court shall: (1)

compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set

aside agency actions, findings, and conclusions found to be--(A) arbitrary, capricious, and abuse of

discretion, or otherwise not in accordance with law...."

As previously noted, the Administration gave its preliminary approval for the process which

has generated so much controversy.  Tab 19 to the record (CCU/AR at 0550) is the letter sent by the

Administration to CCU.  The Administration's Regional Director, Jane Walters, states: "Based on

my review of the revised documents, I am granting preliminary approval for the proposed methods

and procedures applicable to the membership vote. As previously indicated, the NCUA continues

to reserve its right to object to the conversion process at its conclusion *should the actual documents provided to the members or the procedures used differ from those explained in your letters* or if the vote is not conducted in a fair and legal matter" (CCU/AR at 0550) (emphasis added).  On May 13, 2005, Walters notified CCU that it had failed to provide members with required disclosure materials in compliance with Section 708a.4(e) of the Administration's regulations.  According to Walters, the "boxed disclosure" requirements were folded improperly so members would not see the Administration's notice first but rather would see CCU's informational response to the boxed disclosure notice.  Both items were contained on a single sheet of paper with the respective notices on the opposite page. There seems to be no dispute that CCU complied with the regulation except, as the NCUA argues, in the manner in which the compliant notice was folded. The Administration contends that the notice was not prominent or conspicuous because a member would not see its required notice first.  The specific regulation involved provides as follows:

> (e) A converting credit union must include the following disclosures with each written communication it sends to its members regarding the conversion. The disclosures must be offset from the other text by use of a border and at least one font size larger than any other text (exclusive of headings) used in the communication. Certain portions of the disclosures must be capitalized and bolded.  A converting credit union may modify the disclosure with the prior consent of the Regional Director and, in the case of a state credit union, the appropriate state regulatory agency.

The unmodified form of disclosure reads as follows:

The National Credit Union Administration, the federal government agency that supervises credit unions, requires [insert name of credit union] to provide the following disclosures.
1. OWNERSHIP AND CONTROL. In a credit union, every member has an equal vote in the election of directors and other matters concerning ownership and control. In a mutual savings bank, ACCOUNT HOLDERS WITH LARGER BALANCES USUALLY HAVE MORE VOTES AND, THUS, GREATER CONTROL.
2. EXPENSES AND THEIR EFFECT ON RATES AND SERVICES. Most credit union directors and committee members serve on a volunteer basis. Directors of a mutual savings bank are compensated. Credit unions are exempt from federal tax and most state taxes. Mutual savings banks pay taxes, including federal income tax. If

9

[insert name of credit union] converts to a mutual savings bank, these ADDITIONAL EXPENSES MAY CONTRIBUTE TO LOWER SAVINGS RATES, HIGHER LOAN RATES, OR ADDITIONAL FEES FOR SERVICES.

3. SUBSEQUENT CONVERSION TO STOCK INSTITUTION. Conversion to a mutual savings bank is often the first step in a two-step process to convert to a stock-issuing bank or holding company. In a typical conversion to the stock form of ownership, the EXECUTIVES OF THE INSTITUTION PROFIT BY OBTAINING STOCK FAR IN EXCESS OF THAT AVAILABLE TO THE INSTITUTION'S MEMBERS.

4. COSTS OF CONVERSION. The costs of converting a credit union to a mutual savings bank are paid from the credit union's current and accumulated earnings. Because accumulated earnings are capital and represent members' ownership interests in a credit union, the conversion costs reduce members' ownership interests. As of [insert date], [insert name of credit union] estimates THE CONVERSION WILL COST [INSERT DOLLAR AMOUNT] IN TOTAL. That total amount is further broken down as follows: [itemize the costs of all expenses related to the conversion including printing fees, postage fees, advertising, consulting and professional fees, legal fees, staff time, the cost of holding a special meeting, conducting the vote, and any other expenses incurred].

12 C.F.R. 708a.4.

The evidence in the record indicates considerable correspondence from not only CCU but from the state regulatory agency noting the desire to comply with the boxed language requirements of the cited regulation. The Court notes that the boxed language requirement called for in the Regulation was copied almost verbatim in the notice sent out by CCU and included the required notations.

In its letter dated May 13, 2005, the Administration states that it has determined that CCU failed to provide disclosure materials in compliance with Section 708a.4(e). (CCU/AR at 000437). The Administration states that *if the violation is left uncorrected,* it will disapprove the methods and procedures (*Id.*). (emphasis added). The Administration also states that it made it clear to the attorneys representing CCU that the boxed disclosures had to be on the "front" side so that the boxed disclosures are seen by members before the rebuttal side (*Id.*). The Court notes that this requirement appears nowhere in the letters exchanged by the parties nor is there any specific rule which addresses

the folding requirement.  Later on in the letter, the Director goes on to state that the Administration has determined that all ballots received are invalid notwithstanding its prior statement that it would only disapprove if the violation was left uncorrected (CCU/AR at 000438).  As noted, on the third ballot the disclosure was folded differently, and the NCUA argues this resulted in a reduced percentage of those voting who favored conversion.  The Administration takes this as proof supporting its position regarding disclosure.

Under the Administrative Procedures Act, for the Court to have jurisdiction, the "final agency action" must be "an identifiable action or event."*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).  The NCUA's letter dated July 11, 2005 qualifies as such an event or action (CCUAR/000001).

Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made, and "[i]t is well-established that an agency's action must be upheld if at all, on the basis articulated by the agency itself."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29,42-43 &50 (1983).  The Court must determine whether the agency action was based upon consideration of the appropriate factors. *Id.*, at 42-43.

Where Congress has delegated authority to an agency to make rules carrying the force of law and the agency's interpretation of its governing statute was promulgated in the exercise of that authority, the Court applies the familiar two-step inquiry established by *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).  Under *Chevron*, the Court will not defer to an agency's interpretation that contravenes Congress' unambiguously expressed intent. *Chevron*, 467 U.S. at 842-43, 104 S.Ct. 2778.  On the other hand, the Court must defer to a reasonable agency interpretation when the question is one to which the statute does not speak directly. *See Id.* Otherwise, the Court's review

of agency action is governed by the familiar deferential standard established by the Administrative Procedure Act, 5 U.S.C. §§ 701-706(APA): the Court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Under this standard, the Court must assure itself that the agency considered the relevant factors in making the decision, its action bears a rational relationship to the statute's purposes, and there is substantial evidence in the record to support it; but, the Court cannot substitute its judgment for that of the agency. *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir.1998).  The Court must uphold an agency's actions if its reasons and policy choices satisfy minimum standards of rationality. *Id.*

Under the first Chevron threshold analysis, the Court finds that the agency's interpretation of its regulation contravenes Congress' unambiguous expressed intent. Although the rules applicable to charter conversion shall be promulgated by the Administrator, such rules must be consistent with rules promulgated by other financial regulators and such rules shall be no more or less restrictive than those applicable to charter conversions by other financial institutions. 12 U.S.C. § 1785 (G)(I). The statutory amendments granted by the Credit Union Membership Access Act in 1998 did not empower the NCUA to govern the conversion of mutual savings banks.  That is a field already fully occupied by another regulator, the OTS.  The OTS has its own mandated disclosures.  The NCUA may prescribe rules and regulations for the administration of Federal Credit Unions including, but not by way of limitation , the merger, consolidation, and dissolution of corporations organized under its jurisdiction. 12 U.S.C. § 1766.  The Act also provides that an insured credit union may convert to a mutual savings bank without the prior approval of the Board subject to the requirements and procedures set forth in the laws and regulations governing mutual savings banks and savings associations. 12 U.S.C. § 1785 (2)(A).

In approving CCU's vote, the OTS noted that the "disclosures" required by the NCUA were

potentially misleading (CCU/AR 000360).  However, the OTS noted that the Administration's mis-

statements were cured by CCU's response on the opposite page of the required disclosure (*Id.*).  For

all purposes, there is no dispute as to how the vote was conducted, how and when voting materials

were distributed, how disclosures were formatted, and the information provided.  There is no dispute

as to how the disclosure was folded.  The Administration's newly enacted regulation on disclosure

has no counterpart regulation in the OTS.  The conversion is subject to OTS approval.  12 USC §

1785. The OTS approved the conversion.  Once a conversion is completed, the credit union is no

longer subject to Board authority.  112 USC § 1785 (2)(E).  Thus, CCU finds itself in a Catch 22

position. An agency with no power to disapprove of the conversion  prevents the conversion even

when the regulatory agency responsible for approving the conversion has approved it.  However, the

NCUA's power is limited to disapproving the methods by which the member vote was taken or

procedures applicable to the vote.  12 U.S.C. § 1785(G)(ii).  The methods by which the vote was

taken were approved by the NCUA.  The procedure for the vote was also approved.  The required

statutory notices were given.  The vote was conducted in secret and verified by an independent party.

The Court "must, of course, set aside [agency] decisions which rest on an erroneous legal

foundation." *NLRB v. Brown*, 380 U.S. 278, 291-92 (1965) (citation and quotation marks omitted);

*cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

Here, the agency gave preliminary approval, reserving its right to object if the actual

documents provided to the members or the procedures used differed from those explained by CCU's

counsel in prior letters which are part of the record.  At the hearing, all parties agreed that the actual

documents and language used did not differ from those approved and sent out.  The Administrator's

letter dated March 15, 2005 underscores the fact that the methods had been approved subject to the

actual documents being sent. Since the actual documents were sent, any other construction or

objection  by the NCUA is simply  erroneous and silly.  If the NCUA wished to micro-manage the

13

procedure to address how a single page should be folded, it could have either addressed that issue early on or complied with its statutory duties and administered the election rather than delegating its statutory duty to a third party. The statute is clear that the Administration shall administer the vote. *See* 12 U.S.C. § 1785 G(ii). Here, the NCUA relied on CCU to administer the vote through a third party while CCU was operating under what it perceived to be the ground rules based on extensive correspondence with the NCUA. Since the NCUA did not administer the vote, it should not be allowed to complain about the process.

The record demonstrates that the NCUA first noticed the "folding issue" when it conducted an audit in early May. However, this was after the first two ballots had been sent out. Had the Administration been doing what it was statutorily charged to do early on in the process, it could have saved all parties, including CCU, much trouble, time and expense to correct a problem created by the NCUA. The Director has reserved to herself the right to "disapprove *the actual methods and procedures applicable to the membership vote* if the credit union fails to conduct the vote in a *fair and legal manner*." 12 C.F.R. 708a.5(c) (emphasis added). It would appear from a literal interpretation of the regulation that once the vote is conducted in a fair and legal manner, the director, contrary to her assertion, has no authority or discretion to disapprove of the methods or procedures used in the vote.

Section 708a.11 provides for voting guidelines. Members cannot be improperly excluded. 12 C.F.R. 708a.11 Membership lists should be accurate. *Id.* Members must be allowed to vote by written ballot or at a special meeting in person. 12 C.F.R. 708a.11. Special meetings for voting should accommodate those who wish to attend. *Id.* A credit union must also conduct its meeting under appropriate statutory or parliamentary guidelines. *Id.* CCU conducted the election in a fair and legal manner, and met every pre-mailing requirement imposed on it. The NCUA should not be allowed to disapprove a vote due to a situation caused by its own ineptness, which, when reviewed

14

from the entire record, is much ado about absolutely nothing.

In the alternative, the Court finds that the action by the Administration is arbitrary and capricious. Although the Administration spends considerable time in its rejection letter on the positioning of the boxed disclosure, in final analysis, the NCUA's position is that CCU failed to provide members with required disclosure materials in compliance with Section 708a.4(e) (CCU/AR/000006). The record indicates that nothing could be further from the truth. The regulation provides that the credit union must include the required disclosure with each written communication. CCU complied. The disclosures must be offset from the other text by use of a border and at least one font size larger than any other text (exclusive of headings) used in the communication. CCU complied. Certain portions of the disclosures must be capitalized and bolded. CCU complied.

In the review process, the Director takes it upon herself to determine whether the notice to members is accurate and not misleading. There is nothing in the Director's letter dated July 11, 2005 that makes any determination that the notice was inaccurate or misleading. The agency's determination was not only inconsistent with its own regulations, but under all the circumstances, it was arbitrary and capricious.

To prevail on a motion for preliminary injunction, a party must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not dis-serve the public interest. *Affiliated Prof'ls Home Health Care Agency v. Shalala*, 164 F.3d 282 (5th Cir. 1999); *Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246 (5th Cir. 1997). At the hearing, the parties agreed that the case should be determined as a final injunction on the merits. The standard for a final, permanent

injunction is the same as that for a preliminary injunction except that the Plaintiff must actually succeed on the merits. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987).

The Court finds that Plaintiff's request for final injunction should be granted. At the hearing, Plaintiff succeeded on the merits by demonstrating, to the Court's satisfaction, that the NCUA acted arbitrarily and capriciously in failing to certify the member vote. CCU further demonstrated a risk of irreparable harm due to the fact that, without the NCUA's certification, CCU cannot fairly promote itself or compete in an extremely competitive market as either a credit union or a mutual savings bank. The Court finds that the harm caused to CCU outweighs any damage that may stem from an injunction. Finally, the Court finds that an injunction best serves the public interest by upholding the CCU membership decision, reached in a democratic manner and in compliance with all statutes and regulations, to convert to a mutual savings bank.

## RECOMMENDATION

Based upon the foregoing, the Court finds that Plaintiff's Motion for Final Injunction should be GRANTED. The Court RECOMMENDS that Defendants be finally enjoined from requiring Plaintiff to conduct any further votes and that Defendants be ordered to certify the prior member vote for CCU's conversion to a mutual savings bank.

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or

manifest injustice.  *Thomas v. Arn,* 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d

275, 276-77 (5th Cir. 1988).

   **SIGNED this 24th day of August, 2005.**


_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE